(Ottawa County, O., Common Pleas.)

THE STATE OF OHIO ex rel. CHRISTIAN VOGEL, v. THE BOARD OF COMMISSIONERS OF OTTAWA COUNTY, OHIO.

---

The board of county commissioners cannot under pretense of "repairing, improving or enlarging" the court house, proceed under sec. 870, R. S., to in fact build a new court house at an expense of more than $10,000 without submitting the question to a vote of the people.

The fact that the county commissioners in their resolution declare the proposed improvement to be "repairing, improving and enlarging" the court house, is not conclusive on the court.

---

HULL, J.

This action was commenced by filing a petition on the 21st day of August, 1897. Upon the filing of the petition a temporary injunction was allowed as prayed for in the petition by the Probate Judge of Ottawa county, on account of the absence from the county of any common pleas judge. Afterwards a motion to dissolve the injunction and discharge it, was filed which was argued before me at chambers sometime since, and the motion at that time was overruled and the injunction continued until the action could be finally heard upon its merits.

At the time I rendered the opinion upon the motion I stated somewhat in detail the facts in the case as shown by the records of the commissioners and as admitted by the parties, both plaintiff and defendants, but did not at that time express any opinion or render any decision upon the merits of the case, deeming the case one of too much importance to the plaintiff and those he

represents, and to the defendants as well, to render an opinion upon the meager evidence by way of affidavits which we had at that time upon the disputed facts or issues of fact in the case. What I stated at that time as to the facts may be regarded as part of this opinion, and it will not be necessary to go into those facts as much in detail as I perhaps otherwise would, especially those things which are matters of record and set out in full in what I said at that time.

On the 9th day of April, 1897, J. W. Knaub, chief inspector of the department of workshops and factories of the state of Ohio, and F. M. Campfield and J. H. Arbogast, district inspectors, made a report to the commissioners of Ottawa county in regard to the court house building which is the subject of controversy in this action.

It seems that prior to that time (according to the report) pursuant to the statute of the state, five citizens of the county of Ottawa made complaint and application to this department for an inspection of the court house, and according to this report the court house was inspected on the 18th day of March last, and on the 9th day of April, as I have said, or under the date of April 9th, the inspector reported certain things to the commissioners of Ottawa county, as follows:

"On March 18, 1897, an inspection was made of your county building, used for court house purposes, in compliance with request of five citizens of Ottawa county, by the chief inspector and district inspectors Arbogast and Campfield, and we desire to make the following statement, together with an order for remedy for all defects found in the building.

"The entire roof construction over court room in its present condition is weak and inferior. The main roof truss was found to be sagged in center five or six inches, the hip rafters on corners and main rafters were found to be sagged in center two to four inches, a number of rafters broken, and the walls are also spreading out at second floor from court room. We are of the opinion that there should be a new roof over this portion of the building known as the main court room, but we believe that the condition and thickness of walls would not be sufficiently strong to carry such roof as would be required to be constructed by the statutes for such building.

"The west wall was found to be in a very serious and unsafe condition; brick was found to be crumbling, wall cracked, and in our opinion, the entire settled portion of wall and foundation should be taken out and replaced with new masonry. We do not consider this part of your building safe, from the fact that it is a two story building, and the walls

are but eight inches, and we believe that the thickness of these walls would not warrant the building to stand against a severe storm. We were informed while making this inspection that certain fractures which were found were caused some time since by a severe wind storm. If this be true, and we have no reason to doubt the truthfulness of the statement, that the vibrations were such as to cause these cracks, then, certainly, a more severe storm might cause the building to collapse.

"The south wall of this same building was found to be bulged, and in an insecure condition. While this department has no jurisdiction to authorize the putting up of a new buil' ng, we feel it our duty to refuse a certificate such as is authorized by section 2569 Revised Statutes, as amended, O. L. Vol. 62, page 139, on account of the insecure and unsafe condition of building for the purpose for which it is used.

"Miscellaneous Order No. 16.

"1st. Provide an entire new roof and roof construction over main court room.

"2nd. Take down entire west wall and foundation of west end building, and replace with new and substantial masonry.

"3rd. Place tie-rods through north and south walls on west building, rods to be placed at second floor close to west wall with washer on outside tightly drawn up with nut.

"4th. Substantially repair roof over center building.

"5th. Provide means for extinguishing fire through all the buildings, either stand-pipes and hose or some efficient chemical extinguisher, such as is recognized by a board of fire underwriters.

"A very thorough examination was made of this building, and we are of the opinion that even after all repairs have been made and suggestions carried out, you will not have such building as the statutes contemplate for the safety of the public assemblage of people or for the records of the conty and the security of the funds placed in the vault of the office of your county treasury, and for this reason, if none other were taken into consideration, by providing such building as is mentioned in section 859 of the Revised Statutes, which would insure the safety of its records and funds.

"In addition to the suggestions made in this report, we wish to state also, that it would be wise to remove the boiler which is located immediately beneath the court room, for in case of an explosion, it would certainly prove very disastrous. Boilers for all buildings for the public assemblage of people should be placed in a building entirely separate and distinct from main building.

"This order should be compiled with without unnecessary delay. As soon as you have carried out the above, kindly notify this department, when another

inspection will be made, and if found to be in accordance with our instructions, our approval will be given. I will refer you to sections 2568, O. L. 90, page 3; 2569 O. L. Vol. 62, page 139, 2572, 2572a and 2572b, Vol. 92, pp. 408, 409 and 410. Trusting this department will be in receipt of a letter stating order will be complied with without unnecessary delay, or definite action taken toward putting up a new building, I am,

"Yours very truly,

"J. W. Knaub, Chief Inspector.

F. M. Campfield, J. H. Arbogast, District Inspectors."

Some question has arisen as to whether this building is one of the buildings contemplated by the statute to be within the jurisdiction of the state building inspectors, or as they are commonly called, the inspectors of workshops and factories. It is not necessary to discuss the question as to whether this building is within their jurisdiction or not. Certain buildings are mentioned and described in the statutes referred to, which are sections 2572 and certain other sections of the statutes, 2568 and 2569.

Section 2568 proves:

"On application of the owner or person having control of an opera house, hall, theater, church, school-house, or other building except buildings where secret societies are held, used for public assemblages, in any municipal corporation, the civil engineer, and chief engineer of the fire department, or if such corporation has no such engineer, the mayor and two members of council, shall carefully make a joint examination of such opera house, hall, theater, church, school-house, or other building, to ascertain the means provided thereat and therein for the speedy and safe egress of the persons that may at any time be there assembled, and the means provided for extinguishing a fire at or in such place; provided, that when the assembly rooms of such church are situated upon the ground floor, with a sufficient number of low windows, in the opinion of the commission above provided for, to secure safe and easy means of escape in case of alarm, they, shall grant the certificate mentioned in the next following section."

Section 2572b provides:

"It shall be the duty of the state inspector of shops and factories to make such inspection whenever called upon by written demand of the agent or owner of such structure, or upon the written request of five or more citizens of the municipal corporation where such structure is located, and not otherwise."

Section 2569 provides:

"If, upon such examination, it is found that such opera house, hall, theater, church, school-house, or other building is abundantly provided with means for speedy and safe egress of the persons who may at any time be there assembled, and,

if above the first floor, that it is provided therein with water or other equally sufficient agency, and proper means to apply it, so that any fire which may occur at such place can be immediately extinguished, the mayor and persons so acting with him, or a majority of the three, shall issue to such owner or person having control as aforesaid, a certificate of the fact, which shall continue in force one year, unless sooner revoked by council.''

I suppose it is claimed that where the inspection is made by the state inspectors under section 2572b upon the application of five or more citizens of the municipal corporation, that they then have the power to issue the certificate referred to in section 2569. I say there might be some question as to whether this county court house was within the provision of these statutes, but it is not necesary to determine that in this case. And it is doubtful whether the inspectors of work shops and factories have the power, or any power whatever, to order the erection of a new building, and whether they did not transcend their power and authority in suggesting to the county commissioners that a new building be erected. I do not understand that it is any part of their duties as shop inspectors or building inspectors to see that the funds and records of the county are kept in what they regard as a safe and suitable building for such purpose. The purpose and object of these statutes are chiefly to insure safe buildings for the assemblage of the people to protect the public, against being permitted or required to meet in a building of a dangerous character, which has not been provided with sufficient means of egress, or with sufficient fire escapes, or doors of sufficient width, or walls of sufficient thickness, and things of that character. I do not think it is any part of the duty of the shop inspectors to see that the records and funds of the counties of the state are kept in such a place as in their judgment would be a proper place to keep them.

But that question is not necessarily involved here. It is sufficient to say that this report came to the county commissioners on or about the 9th day of April, 1897, without any application as they say on their part to have any such inspection made, or any intention to have it made for the purpose of giving them an excuse to repair this building or building a new one, and there is nothing in the evidence to show that the county commissioners or any one colluded with the state shop inspectors in this matter, or that it was carried on otherwise than in good faith.

This report having been made and this notice given to the county commissioners of this county by these state officials, the commissioners thereupon took counsel with Mr. Gordon, the prosecuting attorney of the county, and also consulted with eminent counsel of the city of Toledo, and a written opinion was procured upon the question as to whether the county commissioners under the law of the state of Ohio might erect a new court house building without first submitting it, or the policy of such action, to the voters of the county.

The commissiones themselves have al been witnesses in this trial, one of them, Mr. Dressler, was called by the plaintiff, and two were called by counsel for the defense, and all of them have stated fully and with frankness their intention and purpose in this matter, and their conduct in relation to it, and I will say now that I see nothing in the evidence showing any fraud or collusion or dishonesty on the part of the board of county commissioners. They have apparently done what they thought or hoped they had the power to do, and have acted largely under the advice and instruction of learned counsel.

After receiving this report, they made an application to the prosecuting attorney for his opinion, and he, together with them, procured the opinion of eminent counsel in the city of Toledo—counsel who had not been engaged upon the trial of this case,—and they were by the prosecuting attorney and by his associate counsel, given a written opinion that they could not build a new building as suggested by this report without first submitting the policy of such action to the voters of the county.

The commissioners testified that they thereupon abandoned the idea and project and purpose which they say they originally had of building a new court house; that they then concluded to enlarge, improve and repair the present court house, and to act under sections 870 and 871 of the Revised Statutes, to which I will hereafter refer. They no longer consulted with the prosecuting attorney of the county, but for certain reasons given by the commissioners when upon the witness stand, that the question was an unpleasant one for him to give them advice about on account of his residence in the county and, certain other matters, they say they sought to relieve the prosecuting attorney of any such unpleasant things, and they therefore consulted other counsel as to their duty in the premises. And on the 6th day of July, 1897, the commissioners met in regular session at the court house and passed a certain preamble and resolution to which I here refer, and which reads as follows:

''The Board of County Commissioners of Ottawa county, Ohio, all members thereof being present and consenting, at a special session thereof at their office this 6th day of July, 1897, state that the said commissioners have carefully investigated the matters hereinafter mentioned, and hereby determine and declare the

facts to be that the court house of said county used for the holding of courts and for the offices of the officers of said county is seriously out of repair and dangerous to the health and lives of said officers and of those persons who may lawfully be in attendance thereat for the transaction of public business or to attend the courts of said county; that said court house is within the corporate limits of the municipal corporation of the village of Port Clinton, and the court rooms in said building are for and are used for the public assemblage of people, and certain of the rooms of said building are for and are used for the keeping of public records and documents and files of said county and of said courts, and the condition of said building is such that the same has become unsafe as a repository of said records, documents and files which are thereby liable to injury, destruction and loss, and by reason of the condition, size and construction of said building the commissioners are and have been unable to provide therein such rooms and means of security as are necessary for the perfect protection of the public monies and property in the office of the treasurer of said county; that by reason of the size of said building and the kind and style of the construction, it is utterly inadequate in its present condition or by the making of any ordinary repairs and improvements thereon, for the necessary purposes of said courts or offices, but it will be and is necessary to take down certain weak and improperly constructed wings and portions thereof, the material whereof may be used in the repair, strengthening, improvement and enlargement of other portions of said building which by repair, improvement and enlargement may be used for the purpose of a court house and county offices which will meet the requirements of the statutes respecting such buildings; that the site of said court house is owned by said county, and is ample for a site for such improved and enlarged building; that there is no other building or buildings at the county seat of said county which is or would be at all fit for or adequate to the uses of a court house or county offices; that the state inspectors of buildings for the state of Ohio have assumed jurisdiction and have proceeded to officially inspect said building and have found and declared and notified said commissioners that large portions of said building are unsafe in their present condition and in method of construction, and have condemned the same and ordered said commissioners to cause certain expensive repairs and improvements thereof and refused the certificate provided for by the statutes relating to the duties of such inspectors, but at the same time have also notified said commissioners that, even when the repairs and improvements by said inspectors

suggested are made, it is the opinion of said inspectors that said building will not then be such a building as the statutes contemplate for the safety of public assemblages of people or for the records of the county and the county treasury, and for this reason, if none other were taken into consideration, the county authorities should be prompted to early action, by providing such building as is mentioned in section 859 of the Revised Statutes, which would insure the safety of its records and funds.

"In view of the foregoing facts and others consistent therewith which may have been omitted from the above recital, be it, by the Board of County Commissioners of Ottawa county, Ohio,

"Resolved, That there is immediate and pressing necessity for the repair, improvement and enlargement of the court house of said county, and that it is our purpose and intention to have the same done as soon as lawfully we may; that the main building of said structure remain and be used, but that the wings or other portions of said building be taken down and the materials thereof, so far as may be, be used in and about said repairs and improvements; that definite plans and specifications for said work be obtained as soon as may be, to be approved by this board; that for the purpose of providing the means necessary for said improvement, the expense of which this board in its judgment estimates and declares will be one hundred thousand dollars ($100,000).

"Resolved, that it is the intention of this board to borrow the said sum of one hundred thousand dollars ($100,000.) to bear interest at 5 per cent per annum, payable semi-annually, principal and interest to be payable at the treasury of said county and as provided in the bonds hereinafter mentioned; and that the bonds of said county shall be issued as required by section 872 of the Revised Statutes of Ohio as amended April 27th, 1896, in denominations of $1,000 each and 100 in number, and bearing interest as aforesaid. Said bonds shall be dated on the first day of September, A. D. 1897, and be made payable as follows: $5,000, on the 1st day of September, A. D. 1898, and $5,000 on the first day of September of each succeeding year thereafter until paid, (the last payment of $5,000, falling due on the first pay of September, A. D. 1917; which said bonds shall be sold as provided by law at not less than the face value thereof and accrued interest."

The auditor was then instructed to give notice that remonstrances against and petitions for said proposed improvement might be presented to the board as is contemplated by law, and such notice was duly given. And on the 7th day of August, 1897, the commissioners met and listened to the petitioners who petitioned in favor of said action, and also

to those who remonstrated against such action. The following is the language in the various petitions that were signed by 2400 people, and presented to the board of commissioners:

"To the county commissioners:

"We, the undersigned citizens and tax payers of Ottawa county, Ohio, hereby express our approval of the wise action of your honorable board in determining the necessity of providing a safe and adequate building for the holding of courts, and the custody of the records and funds of the county, and we respectfully request that your declaration of intention to make suitable and permanent repairs and improvements to the court house at Port Clinton, Ohio, as expressed by your resolution, passed July 6, 1897, be carried out without unnecessary delay."

On the other hand some 180 and odd, including the plaintiff in this action, remonstrated against said action on the part of the board of county commissioners, and appeared at this meeting on the 7th of August, either in person or by representative. After hearing the petitions and those who remonstrated, the commissioners took action in the premises, and passed a certain preamble and resolutions, which are as follows:

"The Board of Co. Commissioners of Ottawa County, O., this day met at their office in said county, their said session being regularly adjourned from a session of said board duly had and held on the 7th day of August, 1897, and which said last named session was regularly adjourned from the special session of said board had and held upon the first Monday in August, 1897, which last named date was a regular date theretofore duly provided by resolution of said board for the holding of a special session of said board, said last named resolution having fixed the first Monday in each month for the holding of a special session of said board in accordance with section 853 of the Revised Statutes of Ohio. At said adjourned session on the 12th day of August, 1897, there were present all of said commissioners, namely, James E. Snyder, President of said Board, and B. A. Powers, Auditor and Clerk of the Board, Emil Dressler, Commissioner, and Cohn McKenzie, Commissioner. And said board being called to order by the president, the following preamble and resolutions were duly presented, and their adoption by said board duly moved by said commissioner Emil Dressler, to-wit:

"Whereas, immediately subsequent to the adoption by this board on the 6th day of July, 1897, of their preamble and resolutions respecting the condition of the court house of this county and respecting the repair, improvement and enlargement thereof, and the issuing of bonds to provide the means therefor, public notice was given thereof by hand-bills and printed newspaper notices in accordance with the directions in said resolution contained, and

"Whereas in accordance with said notices, said commissioners duly met on the 7th day of August, 1897, and heard all petitions for and remonstrances against the said proposed improvements, and

"Whereas, the said board has duly considered said petitions and remonstrances, the said board now reaffirms and declares the truth of all and singular the statements of fact made in their said former resolutions of July 11th, 1897, and the findings, judgments, and opinions set forth in said former resolution (to which reference is hereby made), the same as if they and each of them were herein again set down and repeated, and

"Whereas, There is an immediate and pressing necessity for the repair, improvement and enlargemen tof the court-house of said county, and

"Whereas, This board deems it necessary and expedient that it avail itself of the authority vested in it through and by sections 871 and 872 of the Revised Statutes of the state of Ohio, as amended April 27th, A. D. 1896; now therefore be it

"Resolved, By the Board of County Commissioners of Ottawa county, Ohio, that under the provisions of said law, bonds of said county be issued of the denomination of $1,000 each, aggregating $100,000, and numbered from 1 to 100, both inclusive. Said bonds to be issued for the purpose of repairing, improving and enlarging the court house of said Ottawa county. Said bonds be dated September 1st, 1897), and be made payable as follows: $5,000, thereof September 1st, 1898; and $5,000 thereof on the first day of September of each succeeding year until paid, (the last $5,000 falling due September 1st, 1917, and they shall bear interest at the rate of 5 per cent. per annum, for which the proper interest coupons shall be annexed to and be made a part of said bonds, said interest coupons payable semi-annally on the first day of September and March of each year, both principal and interest payable at the office of the county treasurer of said county at Port Clinton, Ohio. Each bond shall be signed by the county commissioners and countersigned by the county auditor of said county, in their own proper handwriting, and shall have the seal of the county affixed thereto, and each coupon shall be signed by the county auditor.

"Resolved, That the county auditor be, and is hereby instructed to have said bonds and interest coupons properly prepared, and to advertise the same, according to law, to be sold on Tuesday, September 7th, 1897, at 12 o'clock noon, Central standard Time, at the office of said county auditor, sealed bids to be

made therefor. Said advertisement shall be inserted in the Ottawa county News-Democrat and the Ottawa County Republican, such being newspapers of general circulation in said Ottawa county, and also in the Cleveland Plain Dealer, a newspaper of general circulation in the state of Ohio. Each bidder shall satisfy himself as to the legality of said issue before the hour of sale, and shall deposit a certified check or certificate of deposit on any banking company of Part Clinton, Elmore, Oak Harbor or Fremont, payable to E. A. Powers, Auditor, in the sum of $2,000 as a guaranty that said bonds, if his bid be accepted, will be taken up and paid for within ten days from the date of sale. No bonds shall be sold for less than the face value thereof, and the county commissioners reserve the right to reject any or all bids.

"Resolved further, That it shall be the duty of the county auditor to keep a record in a book provided for that purpose of the said bonds, the number, date, amount, time when due, etc., which record shall be kept open for the inspection of all parties interested, at all reasonable hours."

Before the date of sale, however, the injunction was allowed by the probate judge, and the bonds were not sold and no action by way of sale was taken by the commissioners. Certain bids were filed with the commissioners for these bonds, and upon the 7th day of September these bids were opened by the commissioners and their contents made public, but no sale was made although it is suggested by one or two of the commissioners that possibly there was an understanding that the highest bidder was to have these bonds in case the injunction was afterwards dissolved and there was no legal objection to the sale; but nothing was in fact done of any binding force or effect.

The plaintiff brings his action as a taxpayer of this county under the sections of the statute that provide that an action may be brought by a taxpayer where a contract in violation of the law is about to be made by county commissioners or public funds are to be diverted to illegal or improper uses, or an illegal tax levied upon property, and alleges that he appealed to the prosecuting attorney of the county, as the statute requires, to commence the action, and that upon his refusal he begins it himself as a tax-payer.

The petition in substance alleges that the commissioners are guilty of conspiring with certain citizens of Port Clinton with the fraudulent purpose of erection a new court house building instead of in fact making repairs and improvements and enlarging the court house as has been stated in their various preambles and resolutions to which I have called attention.

The plaintiff says that the present location of the county seat in Port Clinton is not as good as some other location might be on account of not being in the central part of the county, and the question of the removal of the county seat has long been mooted, and that the purpose and object of this proceeding is to expend such a sum of money or take such action that the county seat may be forever retained at Port Clinton. In fact it is intimated in the pleadings and arguments in the trial of the case that the real contest here perhaps is as to the location of the county seat,—a contest between Port Clinton and the town of Oak Harbor. This appears somewhat from the pleadings, and crops out in the evidence and arguments in the case all the way through.

It is also alleged in the petition that a great majority of the voters of Ottawa county would vote to remove the county seat from Port Clinton; that the western part of the county is larger in territory, and although somewhat sparsely settled years ago, has become more densely settled, so that the greater part of the population is there, and so on and so forth.

But as to these matters, I do not deem them as bearing upon the issue in this case, or the real question in this case. The commissioners have the right to expend any amount of money that they may legally expend upon the court house where it now stands. They are not required by law to take into consideration any possible removal of the county seat or any controversy or contest over that. The only and real issue is whether this proposed improvement, whatever it may be, can be carried out by the county commissioners without first submitting it to a vote, or the policy of such action, as the statute says, to a vote of the electors of the county.

The plaintiff claims that it cannot be done. The plaintiff claim in the first place that any expenditure over $10,000 under section 2825 must be submitted to a vote of the people; claims next that if that should not be a proper construction of that section, that the proposed improvement here is not in any sense of the word a repairing, improving and enlarging of the old court house building, but claims and alleges that the proposed action is in fact and in truth the building of a new court house in all that the term and words imply.

The defendants on the other hand claim that they may expend any amount of money that in their judgment they deem wise or prudent by way of repair, improvement or enlargement of the court house; that it is a matter submitted to the discretion and judgment of the county commissioners sitting in a quasi judicial capacity, and that their de-

cision therefore is final and not subject to any review in any court.

They claim further, and it is the chief contention here, that the proposed improvement, or poposed action of the county commissioners in this matter, is not the building of a new court house, but that it is in truth and in fact simply a repairing, improving and enlarging of this old court house.

Section 859 of the Revised Statutes provides that the commissioners shall provide a court house, jail and offices for county officers when, in their judgment, the same or any of them are needed.

Section 870 provides:

"The commissioners may, when, in their opinion it is necessary, purchase a site for a court house or jail, or land for an infirmary, at such price and upon such terms of payment as are agreed upon between them and the owner or owners of such property; and the title of such real estate shall be conveyed to the county in fee simple."

Section 871 is the section under which it is claimed that the board of commissioners take this action, and it provides that, "The commissioners, for the execution of the objects stated in the preceding section, or for the purpose of erecting or acquiring any building in memory of Ohio soldiers, court house, buildings for county officers, jail, county infirmary, or any necessary buildings, or bridges, or for the purpose of enlarging, repairing, improving or rebuilding any such building or bridge, or for the relief or support of the poor, may borrow such sum or sums of money as they deem necessary, at a rate of interest not to exceed six per cent. per annum.

Then follow certain provisions as to the issue of the bonds.

Section 2825 provides as follows:

"The county commissioners shall not levy any tax, or appropriate any money, for the purpose of building public county buildings, purchasing sites therefor, or for lands for infirmary purposes, or for building any bridge, except in case of casualty, the expenses of which will exceed ten thousand dollars, without first submitting to the voters of the county, the question as to the policy of building any public county building or buildings, or for the purchasing sites therefor, or for the purchase of land for infirmary purposes by general tax, which said submission shall be made at the annual spring or fall election, next after the proposition for such levy is adopted by the commissioners and placed on their record."

Then follow certain provisions as to the manner in which the ballots shall be printed and how the election shall be carried on, and provides further:

"If the majority of the votes so cast shall be against the policy of such improvements, the commissioners shall not assess any tax for that purpose, but the commissioners may, on the petition of not less than one hundred tax payers of said county, again submit the same question at any regular annual spring or fall election."

The commissioners say in their answer and affidavits filed in the case, that it is true that they propose to levy a tax upon the property of the citizens of the county to pay this $100,000 of bonds, and that it is true that they propose to use and appropriate that money for proposed improvement, or at least so much of it as may be necessary to carry that out, and they say in their records that in their judgment it will cost $100,000.

Now these are the four sections of the statutes, Nos. 859, 871, 879 and 2825, which seem to govern and control in this case. There have been some sections of the statutes, some of which I have referred to in regard to buildings and inspection of buildings, passed since the passage of these statutes relating to the duties of county commissiners, and it is claimed that on account of the provisions of those sections which require buildings to be built in a certain way and permit their inspection by inspectors and conferring upon such inspectors certain powers to order buildings to be rebuilt and repaired, and it is claimed by those provisions the provisions of these sections, or some of them, have been by implication repealed or at least somewhat limited. That the commissioners are bound to obey the notice of orders given by the inspectors under these statutes, as they were passed and enacted after the statutes to which I have called attention.

I think, however, that this case must be controlled by those actions to which I have referred, and that there has been no repeal by implication of any of these sections, and that this case must depend upon the question as to whether the commissioners have the power to expend any sum of money that they may deem best in their judgment by way of repairing, improving and enlarging, and the further question as to whether this proposed improvement is or is not the building of a new court house in fact.

There are very few Ohio decisions upon these statutes. A case in the 24 Ohio St., Commrs. of Defiance Co. v. Croweg, et al., has been cited by the defendant. This was a bridge case, where a bridge was in decay and the commissioners concluded to tear it down and rebuild it as they say, and to expend the sum of $40,000 in that behalf, and the question arose as to whether they had the power to do that without first submitting it to a vote of the people,—whether this was the building of a new bridge within the purvue of the statute, or simply was the repairing of an old one.

The supreme court say on page 500: "It will be observed that the limitation of the general power of commissioners to build and repair bridges, in the third section, does not extend to the repair of bridges."

And it is argued from that, that the supreme court intended to say that if any proposed improvement was, in fact, a repair of a bridge, no matter what the circumstances might be, that the provision of the statute requiring the submission of the question to a vote of the people did not apply, and possibly that construction might be put upon the language; I do not say whether it should be or not. The supreme court says then, "nor does it apply where an important bridge has been destroyed by casualty, and its restoration is necessary for the public convenience."

The statute expressly provides that if a bridge is suddenly swept away or destroyed by casualty, that the commissioners may rebuild it without submitting it to a vote of the people. On page 501 they say:

"It only remains to be considered whether the structure contemplated in this case, was the building of a bridge within the meaning of the third section. It was to cost more that $10,000; and not coming within the exception, it was included in the general inhibition of the section. It was in no fair sense the repair of a bridge. It was to be a new structure, whether it be called the building, rebuilding, or restoration of a bridge. The proposed new bridge, then, not being the repair of a bridge, nor excepted from the limitation of the third section, costing more than $10,000 falls within its provisions. The cost of the proposed bridge was estimated at about $40,000. This expenditure the commissioners were about to make, in building a bridge contrary to the provisions of the statute. The popular controversy on the subject made the case one peculiarly within the reason of the statute, requiring the question to be submitted to the vote of the electors of the county. Having failed to do this, the district court did not err in restraining the commissioners from making the expenditure in violation of law."

That is the rule laid down in that case, and the supreme court there seem to think that the real question was whether that was a repairing or was in fact the building of a new bridge.

"Repairing" has been defined to be the restoration of a building or whatever it might be, to its former state. to bring it back where it was before it went into decay or bad condition. The covenants in a lease to keep buildings in repair mean ordinarily to keep them as they are at the time the lease takes effect. It is urged however that this suit is premature. That it was brought before it

should have been brought; that the commissioners as yet have done nothing, have not expended any money and don't know as they will expend any, and therefore that injunction is not the proper remedy.

In the 27 Ohio St., page 218, the supreme court say in the fourth paragraph of the syllabus:

"In cases arising under these road improvements statutes, where no remedy is named, and the jurisdiction of the board of county commissioners is made the question, proceedings in equity to inquire into the jurisdictional facts, and for injunction, is a proper remedy."

Now it is claimed here that this is a jurisdictional question; that if section 2825 applies, that before the commissioners have any jurisdiction to act in the premises, or issue bonds, or levy taxes, the question must be first submitted to the people, and I think that must be conceded by all, that if that section applies, it is jurisdictional, and that this is an inquiry into jurisdictional facts. So I do not think the action was premature. The commissioners, by their public records and their pleadings in this case say that they propose to expend $100,000; that they propose to levy a tax upon the property of the county to pay the bonds that shall be issued; they had notified the people of the county to appear before them and petition or remonstrate in favor or against said action: they notified the county auditor to give notice prior to such meeting; they notified the county auditor to advertise the sale of these bonds; they had fixed the date of the sale as the 7th day of September, 1897; they admit that they were about to sell the bonds of the county in the sum of $100,000 and to appropriate that money for this proposed improvement. I think that these facts being admitted, that it is clear that the action, if it can be maintained, was not brought prematurely. It is urged further that the action of the board of county commissioners cannot be inquired into in this matter in a court of equity; that if they are acting in good faith, if not acting fraudulently or collusively, that their action in the premises is final; that when the county commissioners say in their resolutions and by their public records, that they propose to "repair, enlarge and improve" a building, that that becomes res judicata so far as they and the people are concerned; that no court has a right to say that they do not in fact propose to improve, enlarge or repair, but do in fact propose to build a new court house; in short, that their action upon that question is final, conclusive and not subject to review in a court of equity upon application for an injunction.

But I think it has always been held that where an inferior tribunal, like a

board of commissioners or the common council of a municipal corporation, are about to appropriate public money in violation of law or contrary to law, or before certain requirements of the law have been complied with, that a court may intervene and interfere, and upon a proper state of facts enjoin the action of such tribunal.

The powers conferred upon a board of county commissioners are perhaps as wide and important as those conferred upon any county officer. They sit in many cases in a judicial capacity, in road matters and ditch matters where things are confided to their judgment and discretion, and where their decision is final and cannot be reviewed however ill advised it may be. They are a tribunal of limited jurisdiction; that' is to say, their powers are limited by the law of the land which created them and conferred those powers upon them. Within those limitations their action cannot be reviewed; beyond them, whatever they may do is of no more effect than the act of any other citizen; and these powers, as the supreme court has said, are to be strictly construed. The people of the state, through their legislature, has said to the various boards of county commissioners, you shall have certain powers over our property; you shall have certain powers to tax us; you shall have certain powers to borrow money and mortgage the property of the county, and have certain powers in the way of laying out roads and ditches, etc.; but whatever powers have not been conferred upon the board of county commissioners they do not have, but they are still reserved.

The supreme court has said in the 11 Ohio St., in the case of Treadwell v. Commissioners, page 190, "The board of commissiners of a county is a quasi corporation, a 'local organization which, for purposes of civil administration, is invested with a few of the functions characteristic of a corporate existence.' (Commissioners of Hamilton County v. Mighels, 7 Ohio St., 109, 115). A grant of powers to such a corporation must be strictly construed. When acting under a special power, it must act strictly on the conditions under which it is given."

That case was cited in the case of Commissioners of Delaware Co. v. Andrews, the 18 Ohio St., with approval.

On page 64 the supreme court say: "In Treadwell v. The Commissioners (11 Ohio St., 190), it was held that a 'board of commissioners of a county is a quasi corporation, a local organization which, for purposes of civil administration, is vested with a few of the functions characteristic of a corporate existence. A grant of powers to such a corporation must be strictly construed.' "

The power to tax, the power to take the property of the citizens of the county and convert it to public use, is one of the greatest powers that can be conferred upon any board or government. As the courts have said, the power to tax carries with it the power to destroy, the power to pratically take from the citizen his property without his having any opportunity to be heard, and convert it to public use. The law has conferred upon county commissioners certain powers in that direction. It has said you may tax the people of the county to a certain extent; you may borrow money in the name of the county by selling bonds, which is the same as mortgaging the property of the county, providing you comply with certain requirements; and unless these requirements are complied with, unless the conditions and limitations of the law conferring this power are complied with, the action of the board of county commissioners is null and void, and shall be restrained by the power of a court of equity.

The power reposed in the board to expend public money and impose taxes as I have said, is one of the greatest powers of government, and can it be said that no court can inquire into the purposes and objects of such a board outside of what their records, which they themselves prepare, indicate is their purpose and object? That they may put upon their records a declaration and intention to expend $100,000 or $500,000 or a million dollars of the public money for the purpose of "repairing, enlarging and improving" a building, and that the people are helpless through the courts to prevent such expenditure of money, if the commissioners say it is for "repair, enlargement and improvement?"

Now, I am unable to arrive at that conclusion from the examination of authorities and the general law of the land, it seems to me that these jurisdictional facts may be inquired into outside of the record which the commissioners have made, and that the taxpayers may come into a court of equity and inquire whether the law is being complied with or not, and inquire, as in the 24 Ohio St. whether the proposed improvement is in fact an "enlarging, improving and repairing," or is in fact the building of a new court house.

I do not find it necessary in this case to decide whether the county commissioners may under a given state of facts expend more than $10,000 in repairing, enlarging and improving or not. In a county where there was a court house costing originally a million or half million, whether the county commissioners might expend $15,000 on such a building by way of repairs or improvements, would raise a question that would be entitled to full consideration. But every case must stand of course upon the facts developed in that case. And I do not

find it necessary to determine whether that could be done or not.

That brings us to a consideration of the question as to whether these proposed improvements are in fact repairs of the old building, or the building of a new one. In my judgment the law is that if the proposed action of the county commissioners is, under a fair construction of the English language, the building of a new court house, that then they would be required to submit the policy of their action to the voters of the county before they could expend any amount exceeding $10,000, and that if it was simply a repairing, enlarging and improving, then, of course, if it was under $10,000 there is no statutory requirement that it be submitted, and whether it would be necessary to submit it if it exceeded $10,000 if it was for the purpose of enlarging, repairing or improving, I do not find it necessary to determine; but I shall determine and decide this case upon the proposition as to whether the board of county commissioners intended legitimately and fairly to repair, enlarge and improve this building in which we sit, or intend, in every sense of the word, or ordinary sense of the language, to build a new building.

At the time the case was heard to dissolve the temporary injunction, no plans were submitted to the court for its inspection; none had been prepared at that time, therefore none could be submitted. And there was no positive evidence as to the purpose or intention of the board except that they said that they intended to expend this money in repairing, enlarging and improving this building. Upon this hearing all of the commissioners were called as witnesses. Mr. Eli Dressler was called by the plaintiff, and I say that the commissoners one and all have stated their purpose, their proposed action, what they propose to do, with candor, frankness and honesty, and they agree as to their purpose, that it has been talked over and that they have certain plans outlined in their mind without having arrived at any exact or definite conclusion; that they had all agreed as to about what they would do in this matter; and I find the facts in this case to be that it is the purpose and was the purpose of the board of county commissioners to tear down the entire west wing of this building, that is the part west of the so-called "central portion" of the building, which is about 30 by 60 feet front. That they were uncertain whether to tear down the whole central part which is about 28 feet square or not. That they might leave some portions of the walls of that part and might not, depending upon the practicability of it as the work progressed. I find that they intend as to the part in which we are now sitting, which was built some 50 years ago, and called the "main part" in these proceedings, which is 40 feet by 50 feet, that they intend to do what is known in architecture as "gutting" it; that they intend to take out all the floors, wood-work, all windows, all the ceiling, take out everything except possibly one partition wall in the lower story which now separates the boiler room from the janitor's part; intend to take off the roof; intend to raise this part one story having a basement, second story and a third story, and that they intend then to rebuild this in such a way as would make it absolutely fire-proof; intend to change the windows and location of them to some extent, make them larger, and put in new windows in the way of glass; in fact, that they had no intention of leaving any portion of this old building as it stands to-day except three dead walls of this part we now sit in, with possibly one brick partition in the story below; that the south wall of this building was in such a condition that it would be necessary to take down at least part of it and with that and these three dead walls as a nucleus, they intended to expend $100,000 in "repairing, enlarging and improving" what there was left.

I find as a fact that outside of these walls they intended to use the heating apparatus so far as possible in the old building the electrical apparatus and water pipes, and some other things. The evidence shows that the part left standing of the old building would be worth from $2,500 to $4,000 probably, if it was built new and the old walls are said to be as valuable as if quite new. Mr. Shively, who was called on behalf of the county commissioners, testified in his judgment that the old walls, the water and electrical apparatus, boiler and all the material that could be used in the building, would be worth $8,000.

The defendants called Mr. Shively as a witness, and he testified that since the commencement of this action he had prepared certain plans which would indicate how this proposed improvement might be made. He says they were prepared at the suggestion of counsel for the defendants; that he never had any talk with the commissioners themselves as to how these plans should be made, or at least with more than one of them, and not much with him. But the commissioners say the plans were made to be used upon the trial of this case, and to show the court how this improvement might be made, and being made under those circumstances, at the suggestion of the commissioners and their counsel, and being made to use as evidence in their behalf in this case, I conclude that they are as favorable to the defendants as the truth would permit so far as indicating their purpose in this matter.

Now Mr. Shively was called and these plans were put in evidence, and I think

we may assume that these plans indicate practically what the commissioners intended to do. It seems to me that they having brought these plans here, having been prepared for use in the case, they are the only definite plans we have in the case. We have no other guide by which we may be guided in the consideration of the facts here except the plans which they themselves prepared.

These plans show that they intend to take down all those portions of the old building which I have mentioned, and intend to increase these dead walls with a stone casing, some 8 inches thick, of cut stone. There was some talk of terra cotta brick, but these plans indicate stone, and the commissioners say they intend to use stone; that they intend to anchor these outside stone walls to the old walls by taking out certain portions of the walls here and there and tying them together, or anchoring them, as it is called; and that in place of the west wing they intend to build a new building about 65 feet front, toward the city, by 96 feet deep, extending south, which would bring it back as far as the main building in which we now sit, and quite a considerable distance beyond, according to these plans. In that part which was to be entirely new and west of the central part which is about 28 feet square, and which new part was to be 65 by 96 feet, there was to be the commissioners' room, the treasurer's office, the recorder's office the probate judge's office, and the private offices of these officers; that in this old part which we are now in on the first floor there was to be the boiler room, coal room, vault, auditor's private office, surveyor's office, and toilet rooms; that on the second floor of the old part there would be the library, sheriff's office, stenographer's office and Judges' room; and that in the new part to the west they intended to have the common pleas room, clerk's office, prosecuting attorney's office, grand jury room and circuit court room. In the center of the new building at the west, — the center of the western front,—it was intended to have the entrance, and through the middle of this new part was to be a hall from which was to be the entrance into these various offices and court rooms I have mentioned. There was to be an entrance to the central part which would lead up stairs to the second floor and into the clerk's office, and from his private office into the court room, and from this entrance access was to be had to the old part of the building. So these contemplated plans as I say anticipate such a building as I have indicated here. The part to the west was to be 65 feet by 96, and was to be entirely new, and the part to the east was to be constructed of cut stone on the outside, with a tiled roof, the building throughout to be made entirely fire proof, the cement floor, iron

joist and girders and all the other things which are ordinarily used in constructing a fire proof building, and the building was to be three stories in height. A front view is shown in one of the exhibits put in evidence. It shows a front elevation of the proposed building, and shows it to be a stone building, three stories high, with a roof over this part somewhat similar to the roof now on, but it was to be of tiling and entirely fireproof. In short, the result of the proposed improvement was to be to all intents and purposes a fire proof court house which would appear on the outside and would in fact be a stone building, the old walls so far as they were left to be used on the inside as is often done in building stone buildings.

Now I find these to be the facts from the testimony of the commissioners themselves and from the testimony of Mr. Shively, the architect who prepared these plans for them for use on the hearing of this case. And I propose to decide this case by determining the question whether or not, under that statement of facts, the commissioners of this county are proposing to "repair, improve and enlarge" this building as it stands, or are proposing to build what to all intents and purposes would be a new court house.

I have already called attention to the section 2825 which provides that "The county commissioners shall not levy any tax, or appropriate any money, for the purpose of building public county buildings, purchasing sites therefor, or for lands for infirmary purposes, or for building any bridge, except in case of casualty, the expenses of which will exceed ten thousand dollars, without first submitting to the voters of the county, the question as to the policy of building any public county building or buildings". etc. The statutes of the state show that in many counties applications have been made to the legislature for power to expend more than $10,000 in repairing, improving or enlarging public buildings under sec. 871—many special acts of that character were cited by counsel in argument,—and it rather seems to have been the judgment of county commissioners and of the legislature that to expend more than $10,000 in repairing. enlarging and improving without submitting it to a vote of the people would require action of the legislature.

But in this case, under this state of facts, shall the court say that this is a "repairing, improving and enlarging," or declare it to be in fact a new building? Now, if this court house had been burned by fire, and all of it destroyed except the three dead walls of this old part and a portion of the south wall, with the wood work all gone and the rest of the building absolutely destroyed, would anybody contend that if the com-

missioners started out with that as a nucleus to expend $100,000, that they would be simply enlarging, repairing and improving the court house that they had? It seems to me that, that, by common consent, would be a new building.

Now the commissioners say themselves that before they begin to expend this sum of money they propose to reduce this building to just that condition, and starting with that, expend $100,000 in repairing, enlarging and improving it. Now if that can be done, sec. 2825 of the Revised Statutes might as well be repealed. If the court should hold that commissioners could do this without submitting it to a vote of the people, the court of the state by such action would repeal that section; for if commissioners can do that, then in a county not having any court house they may build a $10,000 court house, and the next year expend a half million to improve it without first submitting it to a vote of the people.

What is the purpose and object of this legislation? It is not a trifling piece of legislation. The statutes state for themselves the limitations and conditions upon which great power is conferred upon a certain body. The law says you shall have certain powers upon certain conditions. The object of the statute is to permit the people to say whether their money in such a large amount as will exceed $10,000 shall be expended or not. The object of the statute is to prohibit any board of county commissioners who may happen to be in office from expending any such sum as a $100,000 or half a million or a million dollars of the people's money without restriction, condition or limitation; and I think these are statutes, as the supreme court say, that should be strictly construed. They are statutes made for the protection of the people and of the people's property.

We are not here deciding this case alone. Every judgment of the court establishes a precedent for other cases, and for this court to hold under the state of facts found in this opinion that this proposed improvement is simply a "repairing, improving and enlarging" of the old court house, it seems to me would be far from being a just and proper interpretation of this statute.

There have been many authorities cited on both sides. I have not had time to refer to or review them all. The question here is not whether the county seat shall remain at Port Clinton or be taken to Oak Harbor. The question is not whether this county needs a new court house; that may be, and much evidence is offered here tending to show that it does need a new court house, and if that question were submitted by the law of the land to the discretion of the commissioners alone no court would interfere;

but the thing simply for this court is to ascertain as far as possible what the facts are in this case, and from those facts declare the law. I say that is the sole duty of the court. In the argument of the case it has been intimated that the real question is where the county seat should be, and that this case determines whether Ottawa county should have a new court house. That is not a question for the court to decide, but which the law of Ohio has said the people of Ottawa county shall decide, and it would be far from the province of the court to transcend or trespass upon the power and jurisdiction of the people. If the people of Ottawa county desire a new court house, they have only to say so at the polls, and their wishes will be followed by the commissioners who are but their servants and their officers. If the people of Ottawa county do not see fit to build a new court house or expend $100,000 in that behalf, no court has the right to say they shall do it, or they must do it.

Now, as I have said, I find that the commissioners of this county have not been guilty of fraud or any dishonesty in this matter; but I find that they intended in the first place to build a new court house, and that they practically admitted upon the stand such facts as the court finds to be an intention to build what is in fact a new court house, and that being true there is but one judgment that the court can enter, and that is, that the temporary injunction enjoining the commissioners from expending more than $10,000 be made perpetual.

Under the statute which provides for the allowance to plaintiff of a reasonable counsel fee, in actions of this character, a fee of one hundred dollars will be allowed to be taxed as costs and paid by the defendants with the other costs of this section.

John Duff, Chas. G. Wilson and C. H. Graves, for Plaintiff.

Bentley & Stewart, and E. G. Love, for Defendants.